## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## TEXARKANA DIVISION

GLORIA BRADFORD, Individually
and as Class Representative on Behalf
of All Similarly Situated Persons; et al.

            PLAINTIFFS

                                                     NO. 4:05-cv-4075 HFB

VS.

UNION PACIFIC RAILROAD
COMPANY, ADelaware Corporation,

            DEFENDANT.

### PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION
### TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## I.    INTRODUCTION

Plaintiffs submit this Memorandum in further support of their motion seeking

to have this court exercise its discretion to manage this case in the manner most likely

to create a just and efficient resolution of all the claims resulting from the Texarkana

rail disaster, by managing the claims in a Rule 23(c)(4) class action.  Defendant's

opposition to the motion is based not upon the presentation of a better case

management alternative to the model proposed by the Plaintiffs, but upon a desire to

make sure that the claims against it are never addressed at all.

Rule 23 is a flexible procedural tool that federal courts should apply where it

provides an efficient way to resolve common issues once, rather than thousands of

times or not at all.  It is not a substantive rule intended to provide a liability escape

hatch for Defendants who wish to avoid responsibility for an act of admitted

1

negligence.  This case involves one series of acts by Defendant which caused one collision, fires and one toxic release.  Thousands of people were affected in the same way by these negligent acts:  they were forced to evacuate their homes and close their businesses.  Another group sustained property damage, lost property value, and a small group suffered inhalation injuries.

Defendant's feigned confusion about the mechanism for the efficient resolution of these Plaintiffs proposed claims is unconvincing.  Defendant set up a claim center and managed common claims for almost 2,500 people.  Initially, Defendant processed common claims for evacuation, property damage, economic loss and personal injury.  However, Defendant now argues that a similar procedure provided for in Rule 23 cannot work.  Defendant's response muddied the waters and this reply will clear the air.

### A.      The Evacuation Sub-Class

Each person in the evacuation sub-class has the same liability and causation claim.  The boundaries for the evacuation class are rationally based and as Defendant's expert admits, the Plaintiffs' evacuation zone is the same as that established by Texarkana emergency officials.  Each evacuee claims that Defendant caused a collision that caused a chemical release and fires that caused them to flee their homes.  The only variant in this entire sub-class is the extent of the individual damages.  Under Rule 23(c)(4) the Court can and should try the common issues once, not thousands of times, while leaving damages to individual proof in a structured procedure managed by the Court.

**B.      The Property Damage Sub-Class**

Again, all issues of liability and causation of the explosions and fire are common.  The boundary of this sub-class is the evacuation zone.  In this case the inattention of the train crew caused a rear-end collision which derailed and ruptured the tanker car, which in turn led to the explosion, fires, and whatever property damages and devaluation individual plaintiffs can prove in a structured damage proceeding managed by the Court.

**C.      Business Loss Sub-Class**

Some of the evacuees in Texarkana were businesses. They closed and they lost income.  The boundary of this sub-class is the evacuation zone.  The amount of the lost income will also have to be demonstrated in a court-managed damage proof process.  All other issues are common.

**D.      Injury Sub-Class**

Again, all issues with respect to liability and general causation are common with respect to the injury sub-class.[1]  Defendant's expert has recently admitted that the predominant route of exposure will be inhalation and that he expects inhalation injuries to predominate.  Further, experts will testify as to what was released by the collision and in what levels.  Toxicologists will then be able to identify the type of injuries caused by the chemicals released.  Individuals will then have the burden of proving that they have those signature injuries and the extent of their damage in some

_____

[1] In reality, this is really a minor-injury subclass.  All serious injury or death claims are likely going to opt out of any class action.

form of alternative dispute procedure or mini-trial limited to these issues. The boundary of this subclass is the exposure zone.

Only those people in the defined geographic area of the class will be part of the case and able to make claims under the four categories. What Defendant finds so bemusing about the foregoing case and class structure remains a mystery. The truth is that Defendant cannot see what it does not want to see. It is opposed to any case management structure that will actually hold it accountable for the harm it has done. Defendant knows that absent an inclusive claims structure, individuals with relatively small claims, adding up to millions of dollars in the aggregate, will not be able to afford to bring them, so Defendant will simply wash its hands of the community it terrorized and continue with business as usual. That is all its opposition is about. No class means no practical way to bring thousands of claims, which means 100% liability with 0% accountability. Given the management tools available to the Court in Rule 23(c)(4), there is simply no reason for the court to countenance or condone such an unjust outcome to this disaster.

## II.  PLAINTIFFS' SUBCLASSES ARE PROPERLY CONSTRUCTED AND DEFINED BY RATIONALLY BASED SCIENTIFICALLY SUPPORTED EVIDENCE

Defendants are critical of Dr. Zegel's report, but have provided no admissible scientific evidence to contradict Dr. Zegel's findings. In fact, defendants medical and toxicological experts confirm that the plume analysis and proposed class boundaries

for the exposure zone and evacuation zone from Dr. Zegel are scientifically valid and reasonable.

**A.      Defendant's Own Experts support Dr. Zegel's findings.**

With regard to the evacuation zone, Dr. Jay Gandy, unequivocally testified that the evacuation zone boundaries identified by Dr. Zegel in his report were valid and consistent with his understanding of the actual evacuation zone implemented by the city of Texarkana.

> Q:      The evacuation zone, as far as you can tell, is the same evacuation zone that the Texarkana officials identified?
>
> A.      Initiated.  Yes Sir.
>
> Q.      Okay.  So, therefore, you have no criticism of the evacuation zone that Zegel found to have been established by the Texarkana officials, Correct?
>
> A.      That seemed consistent with my understanding of the evacuation zone.
>
> Q.      Okay.  And you were out there on the day of the evacuation?
>
> A.      I was, Yes, sir.  I was.
>
> Q.      So not only were you someone who could actually evaluate the validity of the evacuation boundaries, you are actually a fact witness to it?
>
> A.      I witnessed the evacuation zone.  Yes, sir.
>
> Q.      Okay.  As far as you know, as we said, Zegel's evacuation zone boundaries are valid?
>
> A.      They're consistent with what I – as I understand them to be, yes.

*See Exhibit 1, Deposition of Dr. Jay Gandy, October 19, 2006, p 34-35.*  With regard to Dr. Zegel's exposure zone, defendant has produced no evidence whatsoever to question the scientific reliability of his results.  In fact, the testimony of Dr. Gandy confirms this assertion.

Q.      And it's my understanding that you're not testifying that there could not have been exposures within the class area as defined by Zegel to PAHs.  Correct?

A.      I'm not saying that there weren't exposures.  Now, we might talk about levels of exposures, but correct to your statement as stated.

Q.      Okay.  All right.  Fair enough.  All right, You opened up the door a little bit on these levels of exposure now.  When you're saying - - you've seen Zegel's report?

A.      Yes, sir.

Q.      Okay.  And you've seen what he has defined as the plume area. Correct?

A.      Yes sir.

Page 33

Q.      And you don't have any quibble with the plume area that he's depicted.  Correct?

A.      I have not evaluated the validity of that.

Q.      And I say the plume area.  I should say the exposure area.  As we sit here right now, you have not evaluated the exposure area as Zegel's defined in his report.  Correct?

A.      I've looked at it, but I have not evaluated the validity of it. That's correct.

Q.      And you're not critical of it as we sit here today?  True?

A.      I have not evaluated the methodology and the input parameters that he used, so I don't have a basis for forming a criticism of the results just yet.

Q.      Okay.  And CTEH certainly has someone who can do plume modeling.  Right?

A.      Yes, Sir.

Q.      You've just chosen not to do that at this point in time?

A.      Correct.

Q.      And certainly you could have done your own modeling run of Zegel's input data and determined whether or not his exposure zone was scientifically supportable.  True?

A.      I wouldn't do that, but other's could.  Yes, sir.

Q.      Okay.  And CTEH has not done that though.

A.      That's correct.

Page 34

Q.      I mean, certainly CTEH has the expertise to verify the accuracy of Zegel's plume modeling results. Right?

A.    To evaluate the input parameters and critique that, if that's what you're asking, yes, sir.

Q.    Okay.  Well, right now you have no - - and when I say you, I mean, CTEH - -

A.    Okay

Q.     - - has no alternative exposure zone that you are saying exists with respect to what Doctor Zegel did.  Correct?

A.    At this time, no, sir.

*See Exhibit 1, pp. 32-34.*  While defendant, in its response, claims to have done a technical analysis critiquing Dr. Zegel's report, it is not done by anyone with any expertise in the area of plume modeling or exposure zone identification.  In fact, defendants "technical appendix" is nothing but a misrepresentation.  It was not prepared by any expert or anyone with any purported expertise.  The "technical appendix" is not verified, nor is it supported by sworn testimony, and hence it is not admissible to refute the verified report of Dr. Zegel or his sworn testimony.   In fact, the experts who did have such expertise, that were hired by defendant, chose not to provide any critique or alternative analysis.

On the day of the incident, Dr. Gandy and CTEH arrived at the scene at approximately 10:00 a.m. and began air monitoring activities.  CTEH, at the direction of Dr. Gandy, established both fixed and mobile air monitoring stations throughout what they believed to be the potential plume area.  The locations of the mobile plume monitoring and the fixed plume monitoring are all within Dr. Zegel's exposure zone and provide scientific support for the boundaries that Dr. Zegel has delineated for both the exposure zone and the evacuation zone.  *See Exhibit 2, Area RAE Map & Exh. 3, Integrated Station Locations*.  Finally, three days after the incident, CTEH, at

the direction of Dr. Gandy, identified thirteen (13) locations within the plume area to conduct " wipe sampling" for residuals from the fires. *See Exhibit 4, CTEH Wipe Sample Map*. All of these locations fall within Dr..Zegel's exposure zone and provide scientific support for the boundaries delineated by Dr. Zegel. In conclusion, defendants own technical expert CTEH, and their toxicologist, Dr. Gandy, have provided scientific support for plaintiff's class definitions and the exposure and evacuation zones identified by Dr. Zegel.[2]

**B.    The Affidavits of Shawn Vaughn and David Hall support class certification**

Although Defendant claims David Hall's Affidavit is "at time at variance with" Dr. Zegel's report, Plaintiffs' reading of it, and Shawn Vaughn's Affidavit is that both witnesses support Dr. Zegel's conclusions. Indeed, eyewitnesses to the evacuation, who were hired by defendant to respond to the catastrophe, testified that Dr. Zegel's evacuation zone boundaries are the same as those established by David Hall, Shawn Vaughn and Texarkana officials. *See Defendant's Opposition Brief, Exhibit 1*. Although David Hall's Affidavit indicates that the evacuation order was lifted at 2:10 p.m. on October 15, as a practical matter, most people remained out of their homes until the next day because the fires burned through October 16, 2005. In fact, as Defendant's own expert report indicates, the fire was still burning and there was

---

[2]    Likewise, Dr. Simmons is not critical of Dr. Zegel's findings and he relied on Dr. Zegel's analysis in his Affidavit. *See Exhibit 6, page 38.* Dr. Simmons testified he has no expertise in plume modeling and he has no opinion on what types of pollutants were emitted from the fires. See *Id.*

smoke from the fires detectable as late as 10:00 p.m. on October 15, 2005 at the Wadley Medical Center on 9th and Olive Streets. *See Exhibit 5, p. 8.*

With regard to Mr. Vaughn's statement that it was unlikely that 100% of all targeted residents within the evacuation zone were called, Plaintiffs have no reason to doubt that there were minor flaws in the system. However, as Ms. Bradford and others stated, it was their neighbors and local officials who went door to door and told them to evacuate. Thus, the phone calls worked and it is clear that the evacuation order was enforced throughout the targeted area.

### C.   Defendant's "Real Time" air monitoring data proves that smoke from the plume dispersed throughout Dr. Zegel's exposure zone

There is a good reason why defendants rely only on observations from lay witnesses regarding the dispersion of the plume. Not only do Defendant's Experts support Dr. Zegel, their own Real Time Monitoring provides that the plume dispersed throughout the class area until the early morning hours on October 16, 2006. *See Exhibit 5*.

The Center for Toxicology and Environmental Health (CTEH) and Dr. Jay Gandy, who are located in Little Rock, were already on retainer for Union Pacific and were called shortly after the accident and arrived in Texarkana with an Emergency Response Team. Although most of the dangerous substances had already been burning for almost five hours, CTEH set up mobile and stationary air monitoring stations throughout the exposure and evacuation zones. *See Exhibits 2, 3 & 5.* These stations monitored for propylene (VOCS), carbon-dioxide ($CO^2$) and particulate

9

matter (PM).  Although there were minimal findings for VOCS and $CO_2$, particulate matter (PM) from the fire was located throughout the exposure zone defined by Dr. Zegel.  *See Exhibit 5.*  Indeed, the monitoring location comments, written next to the findings on defendant's report, note such things as "strong odor of burning cross ties", "strong smoke odor."  *See Exhibit 5.*

Unfortunately, CTEH and Dr. Gandy did not monitor for the first five hours of the event and never conducted any Real Time monitoring for PAHs, the class of chemicals in Dr. Zegel's plume model.  However, three days after the accident, CTEH took wipe samples at locations within the plume area.  *See Exhibit 4.*  CTEH took these samples at ground level, from objects such as park benches to determine whether there were any residual deposits of PAHs from the fires.  The results revealed no elevated levels beyond background levels, but Dr. Gandy could not testify that these results proved or disproved PAH exposure throughout the exposure zone.  *See Exhibit 1, p. 6.*  In fact, Dr. Gandy testified that the only available scientific method to prove exposures during the event would be to conduct a plume monitoring analysis similar to what Dr. Zegel did.  *See Exhibit 1, p. 46.*

## III.   PLAINTIFFS HAVE MET ALL THE RULE 23 REQUIREMENTS

As defendants invariably do, this Defendant uses its brief to make the usual arguments that the plaintiff not only cannot meet all of the requirements of Rule 23, but cannot meet any of them.  Its arguments range from the petty to the incredible, making a wide detour around the reasonable.

## A.      Plaintiffs easily meet the Adequacy Requirement

Defendant's red herrings muddy what is the otherwise clear concept of adequate representation. Rather than focus on Rule 23, defendant obfuscates and confuses matters by "papering" plaintiffs with mountains of irrelevant data.  For example, the tax problems that Bradford may have are not relevant to any Rule 23 issue.  Ms. Bradford is an honest small business owner, not a sophisticated multi-national corporation.  Defendant also attacks her husband, who is not even a class Plaintiff, and argues that Ms. Bradford does not have enough of a business loss to be a class representative.  Most, if not all, of Defendant's arguments, are for the jury during the trial on the merits.

Quite simply, Plaintiffs are adequate representatives if  (1)  they do not have interests antagonistic to those of the class members, and (2) if Plaintiffs' attorneys are qualified, experienced and generally able to conduct the proposed litigation and have no conflicts of interest.  *Eisen v. Carlisle & Jacquelin*, 391 F2d. 555, (2nd Cir. 1968) (overruled on other grounds), *Joseph v. Norman's Health Club*, 336 F.Supp. 307, 319 (D.Mo. 1971). See also Newburg on Class Actions, 4th Ed., §3.21.  The purpose of the adequacy requirement is to protect the putative class members' interests.  Newburg on Class Actions, 4th. Ed., §3.21.  The Supreme Court has held that this important function is met where it is "unlikely that segments of the class [Plaintiffs] represent would have interests conflicting with those [Plaintiffs have] sought to advance, and where the interests of that class have been competently urged at each level of the proceeding." *Sosna v. Iowa*, 419 U.S.

393, 403, 95 S.Ct. 553 (1975).  Thus, the Rule 23 analysis of adequacy is cleanly and clearly, explained by the Supreme Court, and, if applied to this case, there can be no doubt that the proposed class representatives are adequate.[3]

Defendants provide NO evidence of conflict among the putative class members and the proposed class representatives.[4] There are no such conflicts. Rather, Union Pacific lashes at the personal trials and tribulations Plaintiffs have gone through in their lives.  It is such tactics that dissuade many potential plaintiffs from pursing their rights and is further evidence that the class procedure is the best way to proceed.

The absurdity of Union Pacific's attacks on Plaintiffs is exceeded only by the irrelevancy of such attacks.  For example, Union Pacific argues that the "named plaintiffs have not proven they are willing and able to vigorously prosecute the interests of the class."  Opposition to Class Cert., Doc. No. 75, p. 29. Long-standing case law holds that challenges to a plaintiff's adequacy based on lack of legal knowledge of the details of the case should be rejected.  *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct 845 (1966), see also Newburg on Class Actions 4th Ed., §3.34.  The rationale for this long-standing rule is that

---

[3]

    Adequate class counsel is also required.  Defendants do not challenge class counsel.  Class counsel has vigorously pursued this case.  Class counsel has no conflicts of interests with the class members, and have been certified before by other Courts to conduct class proceedings.

[4]

    Union Pacific cites to a case, *Bennett v. Nucor Corp* for the proposition that Plaintiff may be inadequate, if they must counter unique defenses*, however,* this case is not published in the Federal Reports and thus carry no weight of law.  Even if reliable, no such defenses exist here.

unsophisticated persons should be allowed to have their day in court.  *Surowitz*,

383 U.S. 363, 372 - 373.

The named plaintiffs here have answered discovery, provided production of

documents, appeared for depositions, and cooperated with class counsel and

defense counsel.  This demonstrates willingness to prosecute Union Pacific for

their admitted breach of duty.  Plaintiffs' lack of conflicts with the putative class

and their desire to pursue Defendant for the benefit of others proves them

adequate.  *Sosna*, 419 U.S. 393, 403, 95 S.Ct. 553.

**B.    The Numerosity Requirement is easily met.**

Plaintiffs have demonstrated that the claims are so numerous that joinder is

impracticable.  Each of the subclasses established by Plaintiff meet this

requirement.  The evacuation subclass contains a population of 7,982.  *See*

*Affidavit of William Zegel attached to original Motion for Class Certification,*

incorporated herein by reference.  The property damage subclass contains

approximately 2,942 residential structures.  *See Id.*.  The economic loss subclass

contains 276 businesses.  *See Id.*  The personal injury/liability subclass, which is

defined by the exposure zone boundaries, contains approximately 10,000 people.

*See Exhibit 7*.  There is great disparity in the cases regarding the numerosity

requirement of Rule 23.  See Newburg on Class Actions, 4th Ed., § 3.3.  For

example, cases with as few as thirteen (13) plaintiffs have been certified.  See *Dale*

*Electronics, Inc. v. R.C.L. Electronics, Inc.*, 53 F.R.D. 531 (D.N.H. 1971).  In an

Eighth Circuit case, the District of Minnesota held that numerosity requirements

were met in a sexual harassment case where sixty-five (65) women had applied. See *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657 (D. Minn. 1991).  Therefore, Plaintiffs have easily met the numerosity requirement.

Defendant apparently concedes that thousands of people were affected by their negligence, but nonetheless insists on contesting numerosity. The argument that Plaintiffs' assertion of numerosity does not take into consideration people who received money from Defendant is nonsensical.  Unless an individual knowingly and lawfully executed a proper release, any payment may reduce his or her claim, but does not eliminate it.  As to numerosity, as opposed to damages, these payments are meaningless.

**C.    The Commonality and Typicality Requirements are Easily Met**

There must be *some* questions of law *or* fact that link the putative class to resolution of the litigation, although not all facts and law must be common to the entire class.  See *Paxton v. Union Nat'l Bank*, 688 F.2d, 552, 561 (8th Cir. 1982). The crux of Union Pacific's argument on the commonality issue is that *not all* legal and factual issues are common.  However, as case law holds, and as Defendant itself admits, this is not the standard.

The argument that no common issue "links the class members" and is substantially related to the resolution of the litigation verges on the bizarre.  All claimants' claims relate to one set of conduct resulting in one collision, resulting in one chemical release, resulting in their assertion of damage.  These plaintiffs are not complaining about one hundred different chemical releases, or one hundred

14

different train derailments caused by one hundred different inattentive train crews. The absurdity of the argument is only confirmed by Defendant's strange rhetorical flourish that asks at page 27 how "negligence" and "liability for punitive damages" can possibly be issues substantially related to the resolution of the litigation. Defendant cannot be serious.  Is it seriously suggesting that the foundational questions whether Defendant was negligent and hence liable, and whether its actions rise to the level of wantonness to warrant punitive damages are peripheral to the resolution of the case?  They are substantial issues in the case and the facts and law are common to all putative class members and typical of putative member claims.

There are many common questions of law and fact with respect to the class: (1) the cause and origin of the incident, (2) duty, breach of duty, and general causation, (3) the violations of  the standard of care, (4) failure to follow safe operational procedures, (4) general and specific signature injuries relating to the exposure to the dangerous plume from the explosions and fires that were a result of the collision; (5) liability for nuisance; (6) liability for trespass; (7) liability for punitive damages; (8) failure to promptly notify emergency personnel regarding an incident and to mitigate, evacuate, warn and otherwise preventing the chemical release at issue from becoming a catastrophic event; and  all of which may be resolved on a class-wide basis pursuant to Fed. R. Civ. P. 23(c)(4).

Defendant's argument that punitive damages should not be certified is equally illogical.  Such damages are awarded based upon the Defendant conduct in

causing the injury, not the effect upon the Plaintiff.  The Constitutional issue raised by Defendant is a complete red herring.  As has been done in many class cases, including those previously cited by the Plaintiffs, punitive damages can be decided after the damage phase and adjusted by the Court, if necessary, to bring them in line with the aggregate damages.

Equally strange is Defendant's argument at pp. 27-28 that inefficiencies in proving "reliance" mitigate against certification.  That is mildly interesting, but what does proof of "reliance" have to do with a train wreck?  Plaintiffs were not induced to buy the Defendant's train, they were forced to evacuate when it crashed.

The argument that liability is unrelated to case resolution is also simply nonsensical.  The simple truth is that every decisive fact in this case is common, except individual damage.  Under Rule 23(c)(4) and the case law there is no reason to refuse to resolve the common issues commonly, because one issue will have to be resolved individually.  Ninety percent efficiency is not as good as one hundred percent efficiency, but it is better than zero efficiency.

Defendant's argument that there are no common issues as to the class members who were affected by this incident (p. 34), seems to be based on the notion that a bad argument might improve with repetition.  Defendant argues that the harm resulting from the collision varied.  Plaintiff concedes and has always conceded that point.  Damage varies in every class action, from securities cases to consumer frauds, to train derailments.  However, they are suitable for class

treatment.  Responsibility for damaging the Class can be decided collectively, while individual damages can be decided individually.  This is hardly a revelation. Defendant makes the usual arguments, but they all boil down to the same thing: different people suffered different damage as a result of a single act of wrongdoing.  Point taken, but it is a meaningless point.  It does not affect the existence of common questions as to everything but damages, and does not affect the Rule 23(c)(4) certification of the common issues.

The typicality and commonality analysis are similar in that they assess issues of fact and law.  The former measures such common issues between class representatives and the latter makes such comparisons as to the putative class members.  See Newburg on Class Actions, 4th Ed., §3.22.  The foregoing demonstrates that commonality exists among the class members, i.e. a huge explosion and fire were caused by Union Pacific's breach of applicable standard(s) of care, such facts and law being applied to the entire class.

This simple analysis also applies to the named plaintiffs (class representatives) vis-a-vis the class members.  Union Pacific can again make no substantial argument that such facts and law apply differently to the named plaintiffs than to the class members, thus, using the same analysis that establishes commonality, typicality is also demonstrated.

/ / /

**D.     The Common Issues Predominate and the Class Mechanism is the Superior Method**

Union Pacific argues that individual issues predominate over common issues regarding evacuation, property damage, economic loss, the personal injury class, and punitive damages.  The evidence presented by Plaintiffs throughout this brief and below proves predominance.  In fact, defendant's own experts have turned the tables on them.

**1.     The testimony of Defendant's Expert Henry F. Simmons supports class certification**

With respect to personal injuries, plaintiffs are seeking to certify common issues such as duty, breach and general causation.  The testimony of defendant's expert, Dr. Simmons, proves that Plaintiffs can certify a class of inhalation related injuries.  The testimony of Henry F. Simmons in his Affidavit is limited to the issue of specific causation.   Dr. Simmons testified as follows:

> Q.     Okay.  So the question that you answered in this affidavit was a specific causation question?
> MR. PATTERSON: Form.
> THE WITNESS:
>        Yes.  I answered the question that basically one individual who's had an experience is not going to be reflective of the experience that a number of other individuals have had who have also been exposed.
> BY MR. KARNAS.
> Q.     I understand.  And we agree that's specific causation?
> A.     Correct.

*See Exhibit 6,  pp. 20 - 21*.  With respect to general causation, Dr. Simmons agreed that it is a certifiable question.

> Q.    Okay.  Would you be able to determine - - answer that general
> causation question for us by looking at the review of literature
> that's available and any other materials –
> MR. PATTERSON: Form
> MR. KARNAS:  – with respect to whether or not on a class wide
> basis exposure to PAHs could cause harm?
> MR. PATTERSON: Form
> THE WITNESS:     If I were to study the body of literature and
> look into the individual exposures and things of this nature, I could
> provide some input into that question, **yes**, into the answer of that
> question.

*See Exhibit 6, pp. 25, 21 - 22*, emphasis added.  In fact, Dr. Simmons

testified that with respect to common injuries associated with exposure in this case,

he believed that inhalation type injuries would predominate throughout the class.

> MR. KARNAS:       And, indeed, if we did expect some type of
> injury to result from this exposure, it would be an inhalation injury.
> Fair statement?
> MR. PATTERSON: Form
> THE WITNESS:     I think an inhalation exposure would be the most
>                  prominent consideration.
> BY MR. KARNAS:
> Q:    Alright.  We've got three routes of exposure.  Right?
>       Essentially,  inhalation, absorption, and ingestion?
> A:    Those are the three most common.
> Q:    Right, and in this case the most common form of exposure you
>       would expect to be inhalation.
> A:    **I believe that would be predominant.**

*See Exhibit 6, pp. 46 - 47.*  Not only did Dr. Simmons testify that the most

predominant route of exposure would be through inhalation, he also testified that

inhalational type injuries would predominate throughout the class.

> MR KARNAS:       Right.  Let me- - let me say it this way. If the
> predominant route of exposure in an event like we have here in this
> case is inhalation ,**you would expect, would you not, that the
> predominant injury would be some type of injury related to the
> inhalation.**

19

> MR. PATTERSON: Form objection.
> MR. KARNAS: Right.
> THE WITNESS: **Yes.**
> MR. PATTERSON: Object.

*See Exhibit 6, p. 51.*  In conclusion, the testimony of Dr. Simmons, not only supports Plaintiff's initial theory that general causation is certifiable, it also supports certification of a class of inhalational injuries.  These inhalational injuries are indeed the respiratory distress,  such as shortness of breath and difficulty breathing and other symptoms, described by class representative,  Ms. Stella Patricia Smith.  Hence, it is clear that common issues predominate throughout the personal injury subclass, as they do through the remainder of the other subclasses.

**2.     Defendant's Claim Processing Efforts Reveal That Class Certification Is Proper**

On October 16, 2005, the day after the accident, Defendant began soliciting claims from victims.  To this end, defendant set up a claims center to process and evaluate claims.  Since litigation began, plaintiffs have been conducting discovery regarding the defendant's claims processing center.  Plaintiffs hired an independent analyst, Gracie E. Shepherd, to review and analyze the claims and determine whether, on a statistical basis, common questions of fact exist among the claimants, and if so, whether such common questions predominate throughout the proposed subclasses?  The answer to both questions is yes, and Ms. Shepherd's findings are summarized below.  *See Exhibit 7 Affidavit of Ms. Shepherd.*

During the time it was processing claims defendant Union Pacific received a total of 1,058 claim packets on behalf of approximately 2,500 people. *See Exhibit 7.* The categories of claims received by defendant Union Pacific, were divided by them into common categories: 1) claims for real property damage; 2) claims for, personal property damage; 3) claims for economic loss; 4) claims for evacuation costs, and 5) claims for personal injuries. These common categories were established by defendant itself while evaluating the types of claims submitted. The common categories of claims established by defendant during its claims processing efforts correspond, almost identically, to the subclasses in plaintiffs' motion for class certification, which are, 1) evacuation; 2) property damage; 3) economic loss; and 4) liability. *See Exhibit 7.*

The forms Defendant used to evaluate claims asked the same identical questions of each claimant in each category to determine whether or not that claimant had a valid claim. *See Id.* The questions asked of each claimant by defendant are identical and common throughout the forms for each of the categories. *See Id.* Likewise the responses by the claimants were similar. *See Id.* In the attached affidavit, Ms. Shepherd testifies as follows:

> It is clear that common questions of fact were asked of each claimant on each form and the responses were equally uniform. It is clear that common questions of fact predominated throughout each of the common categories established by defendants during their own claim processing procedures.

21

Further, Ms. Shepherd found that approximately ninety seven percent (97%) of claims paid are within the class boundaries proposed by the plaintiffs and that it appears that the class boundaries proposed by plaintiffs are almost identical to the boundaries established by defendants in their claims processing.

Attached to Ms. Shepherd's Affidavit is a illustration which depicts the locations of claims paid by defendants in comparison to the plaintiffs' proposed class boundaries. *See Id*. In fact, it appears as though defendants have paid some claimants who are located outside the proposed class boundaries. *See Id*. Ms. Shepherd determined that out of the total claims paid, approximately ninety three percent (93%) were for evacuation claims, and that the other predominant claims were for property damage [real and personal], economic loss [wage loss and business interruption], and personal injury.

Ms. Shepherd concluded that:

the total population within plaintiffs' proposed class boundaries for the evacuation zone is approximately 7,900, and the total population within the proposed exposure zone is approximately 10,000. That defendant considered claims for a total of 2,500 people of which 1,560 were located within the exposure zone (approximately 16% of the total exposure zone population) and 1,930 were located within the evacuation zone (approximately 24% of the total evacuation zone population). This subgroup is a statistically significant percentage of the total population within both the exposure zone and the evacuation zone, and the results of my analysis can be applied with certainty throughout the population.

Thus, based on Ms. Shepherd's analysis of defendant's claims procedure, and her statistical analysis, common questions of fact exist and predominate throughout the proposed subclasses.

The plaintiffs also took the deposition of defendants Director of Claims, Herbert Stuart.  His testimony supports certification.  Mr. Stuart testified that the common issues of fact that predominated were for property damage, economic loss, and evacuation:

> Q.     Okay.  So we've got property damage, lost wages and then the compensation for the evacuation related expenses.  Those are the common types of claims that are made – that were made in this case?
>
> A.     That were made at the claim center, yes.

*See Exhibit8, p. 40.*  Mr. Stuart also testified that the highest percentage of claims paid were for evacuation.

> Q.     Okay.  All right.  And I told you that in our statistical breakdown here of these claims we've approximated 93 percent of all claims paid to be evacuation claims.  Does that sound about right?
>
> A.     Yeah.  I'm not going to confirm your numbers because I've not added that up, but I will give you that it wouldn't surprise me that it would be 90 percent or better.  It would be temporary living expenses and stuff, yes.
>
> Q.     Okay.  So it would be a fair statement to say then it wouldn't surprise you that at least 90 percent of all claims paid were paid for evacuation related expenses?
>
> A.     Yes.

*See exhibit 8, p. 39.*  Therefore, based on Mr. Stuart's testimony, at a minimum, the evacuation claims were common, typical and predominated as 90% of all claims were for evacuation.  Like the evacuation subclass, plaintiffs real property subclass is equally certifiable.  In fact, like Dr. Simmons and Jay Gandy before him, Defendant's real property expert, Brian Bonner, turned the tables.

3.    **The testimony of defendant's Real Property Expert,
        Bryant Bonner supports certification of the property
        damage subclass**

At the outset, the defendant obtained an Affidavit from Bryant Bonner, a
local real property appraiser, but did not inform him that plaintiffs were also
seeking, as part of their property damage class, compensation for property
devaluation.[5]  Mr. Bonner's Affidavit does not address this issue.

```
10    Q.    Okay.  And so it's fair to say that this
11          affidavit, this Exhibit 1, you did thinking in the
12          context of actual real property physical damage to the
13          property; is that right?
14    MR. ROMMEL:  Objection, form.
15    A.    Correct.
16    Q.    (BY MR. KARNAS)  I see.  Okay.  You didn't --
17          this affidavit is not done with respect to whether or
18          not the evacuation order was devaluing the property?
19    A.    Nothing was said about the evacuation order.
20    Q.    Okay.  No one ever told you about the
21          evacuation order?
22    A.    Not to my know .(sic).
```

*See Exhibit 9, p. 42.*  After taking the deposition of Mr. Bonner on October
2, 2006, Plaintiffs now understand why that question was never posed to him by
defendant.  Mr. Bonner testified that all properties within the proposed class
boundaries that received the evacuation order as a result of defendant's conduct
could indeed have been devalued by that singular event.  He also testified that it is

---

[5]

In their fourth amended complaint, at paragraph 17, and in the Ad Damnum clause plaintiffs
seek "Reasonable and just compensatory damage for property damage,  evacuation and the loss
and use and enjoyment of their property and the diminution of value of real property ..."

feasible to conduct a class wide appraisal of properties damaged by the events by using an appraisal method known as multiple regression analysis[6].  *See exhibit 9*.  A sample of Mr. Bonner's testimony is below.

```
16    Q.     There's a method that we can use to do a
17           class-wide mass appraisal and that is multiple
18           regression analysis --
19    MR. ROMMEL:  Objection, form.
20    Q. -- right?
21    A.     Yes.
```

*See exhibit 9, p. 73*.  Mr. Bonner further testified that multiple regression analysis is an appraisal technique that can be used to define the class, .and is a scientifically acceptable appraisal method.

```
6     Q.     But the method that we're talking about that
7            came (sic) to be used to define the class, the multiple
8            regression analysis, is a scientifically acceptable
9            method used in your industry, true?
10    MR. ROMMEL:     Objection, form.
11    A.     Yes.
```

*See exhibit 9, p. 76*.  Mr. Bonner further testified that the evacuation order was a common event that effected the entire class in the same manner.

```
22    Q.     Well, we agree the evacuation order was a
23           one-time order, right?
24    A.     Yes.
25    Q.     Okay.  And affected everybody in that class of
1     people the same way, correct?
2     MR. ROMMEL:  Objection, form.
3     A.     As far as I know, yes.
```

---

The appraisal method  of multiple regression analysis is a technique first used by county appraisers to conduct mass appraisals over a large area, and has subsequently been used by appraisers. *See Exhibit 9*, page 25.

```
4    Q.    (BY MR. KARNAS)  Okay.  And, I mean, they
5          either had to leave their homes or not, right?
6    A.    Had to go somewhere.
7    Q.    Okay.  All right.  And that was a one-time
8          deal, right?
9    A.    Yes.
```

See exhibit 9, pp. 34-35.  Mr. Bonner further testified that he previously has

been able to look at a single environmental event and determine whether it effects a

large number of homes' values in the same way.  See Exhibit 9, pp. 26-28.

Thus, Mr. Bonner unequivocally testified that he could determine on a class

wide basis, whether the evacuation order devalued the properties of putative class

members.

```
19   Q.    Well, when we're talking about properties that
20         you've appraised in the past to determine whether or not
21         environmental or external factors have affected the
22         value, you'd look at the as-if affected and as-if
23         unaffected, right?
24   A.    Right.
25   Q.    Okay.  Well, what do you -- where do you get
1          the as-if unaffected from?
2    A.    Similar neighborhoods, competing
3          neighborhoods.  Again, you'll have to give me a
           boundary of where you are, I'd have to produce that
           boundary in a
5          competitive neighborhood and see what they're selling
6          for and then do my comparison from there.
7    Q.    Gotcha.  So it would be important in analyzing
8          whether the class affected by the evacuation order has
9          actually lost value to have a neighborhood with similar
10         characteristics, but not affected by the evacuation
11         order, right?
12   MR. ROMMEL:  Objection, form.
13   A.    Correct.
14   Q.    (BY MR. KARNAS)  That would also -- we know
15         that as what's called a control group, right?
```

```
16    A.    Correct.
17    Q.    Okay.  And you could do that in this case?
18    A.    I -- I think it could be done.
```

See Exhibit 9, pp. 50-51.  With regard to Mr. Bonner's Affidavit, in the context of physical damage to real property, he again stated that multiple regression analysis could be used on a class basis to appraise physical damage to the subject properties.  In response to questioning from his own defense counsel, he stated as follows:

```
1     Q.    Okay.  We talked about and you were asked
2           about multiple regression.  Do you remember that
3           conversation?
4     A.    Yes.
5     Q.    Okay.  Can multiple regression prove that an
6           explosion or fire caused damage to a house?
7     A.    Hypothetically, yes.
8     Q.    To a single house?
9     A.    Hypothetically, yes.
10    Q.    Okay.  Can multiple regression be used as a
11          way to say that while one house was damaged by a fire,
12          all of the other ones were damaged by a fire?
13    MR. KARNAS:  Form.
14    A.    Your question is sort of a leading question in
15          that -- hypothetically, yes.
```

See exhibit 9, page 59.  While the above testimony appears inconsistent with Mr. Bonner's Affidavit testimony, it actually is not because defense counsel never asked the question whether multiple regression analysis could be used on a class wide basis to evaluate either physical property damage or real property devaluation. See exhibit 9.  In fact, defense counsel never told Mr. Bonner: 1) the identities of the class representatives;  2) their addresses; 3) the location of their properties; 4)

the  nature of their claims; 5) the neighborhood to be considered; and 6) the proposed class boundaries.  *See Exhibit 9, pp. 15-18, 21-28, & 41.*

Defendant spins the horrific events of October 15th into something tantamount to a holiday picnic.  The fact of the matter, one that predominates over all, is that these people, by no fault of their own, were rudely awakened to the horrific sounds, sights and odors of a massive railroad collision that resulted in explosions, fires and a chemical plume that spread throughout the community. They were removed from their homes and lost the use and enjoyment of property; the loss of which is compensable under law, and that predominates in this case.

**E.      The Class Action is the Superior Procedural Method and the Proposed Classes are Manageable**

Union Pacific's argument that a class in this case is unmanageable is transparent.  First, train wreck cases have been certified before, and have been deemed manageable.  Union Pacific does not distinguish why this case is any different from other train wreck cases that have been certified as class cases. Second, and importantly, their own claims processing center belies their argument. UP itself implemented a process by which their victims could seek limited re-numeration where such people were unrepresented by counsel.  Now that these victims can actually seek real compensation through Rule 23, Defendant claims that it cannot work.

/ / /

1.      **Admitted Liability Is All The More Reason For A Managed Claims Process**

Defendant in this case has long recognized that its employees' gross incompetence and reckless disregard for the risks represented by freight trains hauling dangerous chemicals caused the injuries to this community, including the death of one of its members. It has, nevertheless ducked, weaved and sidestepped its responsibility for those injuries by initially denying that it was liable; by making an absurd assertion that preemption applied to this case, although its facts placed it squarely outside preemption as applied in this Court; and now by trying to make it as difficult and expensive as possible for plaintiffs to seek redress in this Court.

Having initially argued that nobody can recover here because it is not liable, Defendant now, apparently, argues that nobody can recover here because it admits it is. If Defendant is, finally, ready to concede what everybody knew from the moment their trains collided, there is more, not less reason to have a managed claims process whereby all and not a few of the people with claims have them resolved.

Defendant seems to be asserting in its reply that if it admits liability there is no reason to have a class action. The opposite is true. Without a class action, each claimant will have to go through the expense of hiring an attorney to file formal pleadings to seek redress of a claim to which there is no defense anyway. They will then, assuming Defendant admits liability, clog this Court's system with hundreds or thousands of cases requiring separate jury panels to decide damage cases one at a time. Defendant argues that this is a better way to assess damages for admitted liability:

Better for whom? The only "benefit" in this approach is to Defendant, because citizens will not be able, as a practical matter, to file those cases or, if they do, obtain a trial date in their lifetimes.  The paradox will be that the more clearly liable the Defendant is to the claimants, the less likely it will be to actually be held responsible.

If Defendant is liable, then there is all the more reason to make proof of damages and the compensation of claimants as straightforward as possible.  A single class case, especially with liability admitted, will allow the Court to manage a single case and a single damage valuation procedure using bellwether cases, settlement grids, mediations, short arbitrations, special masters and other devices.  This has been done before and can be done again.  The Court can call in one set of lawyers for one regular status or management conference, rather than scheduling dozens, and quickly establish potential settlement value for largely identical cases.

Rule 23 is not substantive.  It is a procedural tool intended to help the Court to reach finality; not to help defendants avoid it.

## IV.   DEFENDANT'S SUPPLEMENTAL 5TH CIRCUIT AUTHORITY DOES NOT REPRESENT THE SAME CLASS ALLEGATION AND TRIAL PLAN REQUESTED BY PLAINTIFFS IN THIS 8TH CIRCUIT LITIGATION

Defendant submitted a recent Fifth Circuit decision as supplemental authority for its Opposition to Plaintiffs' Motion for Class Certification, i.e. *Steering Committee v. Exxon Mobil Corporation*, ---F.3d. ---, 2006 WL 2383220 (5th Cir. Aug. 18, 2006). That case may have involved a class of individuals affected by an explosion from a single event and source, however, that class' request for certification and the

management of the proposed class claim significantly diverge from Plaintiffs' request and trial plan.

The *Exxon* case involved a chemical explosion in a Baton Rouge chemical plant.  After hundreds of suits against Exxon were filed, they were consolidated for trial purposes.  It is at this time that a new complaint was filed proposing class certification under Rule 23(b)(3).  *Id.*  In order for a matter to obtain certification under that rule the requesting party must demonstrate "both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy."  *Id.* at *2, *citing Bell Atlantic Corp. v. AT&T Corp.,* 339 F.3d 294, 301 (5th Cir. 2003).

The Fifth Circuit concluded that the plaintiffs in *Exxon* did not meet their burden under Rule 23(B)(3).  The court concluded that the common issues did not predominate the individual issues surrounding exposure and damages.  The Fifth Circuit also concluded that the plaintiffs had failed to meet their burden to demonstrate that there was a proposed superior class method to manage the case as compared to alternative methods of adjudication.

The conclusions made by the Fifth Circuit have no bearing on the present case because: (1) Plaintiffs have requested certification pursuant to Rule 23(c)(4); (2) Plaintiffs have proposed clearly defined subclasses; and (3) Plaintiffs have proposed a trial plan to manage the certified class, something that was missing from the plaintiffs request in the *Exxon* case.

Plaintiffs in the present case recognize that under the facts and circumstances of the train derailment and subsequent explosion, there will be individualized damages issues. Nevertheless, Rule 23(c)(4) permits the certification of particular issues to be determined on a class-wide basis. In the present case, there was one event that is the genesis of this litigation, i.e. the ramming of one Union Pacific train into the rear of another. There was one cause for the explosion, i.e. it was a result of that collision. There was one overriding cause for the alleged property damage, evacuation damage, business loss, and personal injuries, i.e. the train collision and resultant explosion. The unified adjudication of the liability, general causation, and punitive damages issues will serve judicial efficiency, reduce Plaintiffs' and Defendants' costs, and ensure recovery to all victims, not just those who are able to bring suit. These issues are better handled in one joint trial instead of in thousands of individual trials. This is what is envisioned and permitted by Rule 23(c)(4).

The plaintiffs in *Exxon* cited to the *Sterling* case to support their position that a class action was the superior method of management of their litigation. *See Sterling v. Velsicol Chemical Corp.* 855 F.2d 1188 (6th Cir. 1988). Unfortunately for the putative class members in *Exxon*, class counsel did not, through their pleadings, present a bifurcated trial plan, similar the one presented in *Sterling*. The *Exxon* Court noted this absence and ruled against the plaintiffs because they had failed to present such a plan. *Exxon at *4*. However, the *Exxon* court did indicate that it would be acceptable to bifurcate a class action and provide class treatment solely to certain class-wide liability issues. *Id*. The *Exxon* court similarly accepted the approval of a

32

mass accident class action in circumstances within which the district court had been presented with a manageable trial plan including bifurcation and subclasses proposed by class counsel. *Id. citing Watson v. Shell Oil Co.,* 979 F.2d 1014, 1017-18 & n.9, 1024 (5th Cir. 1992) and *Sala v. National Railroad Passenger Corp.*, 120 F.R.D. 494 (E.D. PA 1988).

Plaintiffs in the present case proposed a simple and efficient bifurcated trial plan to use in order to manage the claims arising from this single disaster:

- There would be one trial for general liability instead of thousands.
- There would be one trial as to whether Defendants' conduct caused the explosion and subsequent chemical release.
- There would be one trial and one award of punitive damages.
- Thereafter, individual damage mediations, arbitrations, settlements or trials limited to individual causation of individual damages can commence.

Therefore, the *Exxon* case does not squarely meet the facts and circumstances of the present case.  Nevertheless, it can be reasonably concluded that the *Exxon* court would grant class certification pursuant to Rule 23©)(4) and permit the bifurcated trial plan proposed by Plaintiffs given the court's expressed reasoning.

## V.     CONCLUSION

Defendant wants to resolve this case.  It knows it is liable and that it has no defenses.  It just wants to resolve the case without taking real financial responsibility. It can best do that by isolating working people who could not proceed on their own against a billion dollar opponent.  The Class Action lowers the cost for plaintiffs and

levels the playing field.  This will force a fair resolution, not the lopsided one based upon wealth and access to the judicial system that Defendant seeks.

Defendant acted commonly to create common harm.  There is no need to force that to be proved thousands of times and thereby bar the courthouse doors to the community impacted by Defendant's recklessness.  The class mechanism is designed to allow the efficient resolution of mass claims in cases like this.  It is a tool the Court can and should use.

**RESPECTFULLY SUBMITTED** on the 3rd day of November, 2006.

M. David Karnas
BELLOVIN & KARNAS, P.C.
131 East Broadway Boulevard
Tucson, Arizona 85701
Telephone: (520) 571-9700
Telecopier: (520) 571-8556
Email: karnas@bellovinkarnas.com

  s/M. David Karnas
M. David Karnas

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, M. David Karnas, one of the attorneys for the Plaintiffs, hereby certify that on the3rd day of November, 2006, I electronically filed the foregoing Reply re: Class Certification with the Clerk of this Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter, including Defense counsel listed below:

**_Attorneys for Defendants:_**
George L. McWilliams
Sean F. Rommel
Patton Roberts McWilliams & Capshaw
Century Plaza, Suite 400
2900 St. Michael Drive
Texarkana, Texas 75503


   s/ M.David Karnas
M. David Karnas
BELLOVIN & KARNAS, P.C.
131 East Broadway Boulevard
Tucson, Arizona 85701
Telephone: 520-571-9700
Telecopier: 520-571-8556
Email: karnas@bellovinkarnas.com

**ATTORNEYS FOR PLAINTIFFS**